514 P.2d 847

**Robert MAESTAS and Alice B. Nunn, Petitioners-Intervenors-Appellants,**

v.

**NEW MEXICO PUBLIC SERVICE COMMISSION, Respondent-Appellee,**

**Southern Union Gas Company, Respondent-Intervenor-Appellee.**

**No. 9759.**

Supreme Court of New Mexico.

Sept. 28, 1973.

Peter C. Mallery, Albuquerque, for appellant.

David L. Norvell, Atty. Gen., James L. Parmelee, Jr., Agency Asst. Atty. Gen., Santa Fe, for Public Service Commission.

Montgomery, Federici, Andrews, Hannahs & Morris, Seth D. Montgomery, Santa Fe, Jack Hertz, Dallas, Tex., for Southern Union Gas.

## OPINION

McMANUS, Chief Justice.

On June 14, 1971 Southern Union Gas Company (Company) filed an advice notice with the Public Service Commission (Commission) which gave notice to the public and to the Commission of certain revised rate schedules. The purpose of this filing was to propose that the Company's proferred rule 20 (Adjustment of Rates to Compensate for Changes in Cost of Purchased Gas) should govern the Company's rate schedules, excepting therefrom seven special contract customers. The rule was properly filed with the Commission and its contents are as follows:

(a) The provisions of this Section 20 shall be applicable only to those rate schedules of the Company (herein called "Affected Rate Schedules") containing substantially the following statement as

one of the conditions of service thereunder: "The rates set forth herein shall be subject to adjustment to compensate for changes in the Company's cost of purchased gas, as provided in Section 20 of the Company's rules and regulations on file with the New Mexico Public Service Commission."

(b) Within forty-five (45) days after each March 31, June 30, September 30 and December 31, beginning with June 30, 1971, the Company shall file with the Commission a written report indicating (1) the total number of Mcf of gas, calculated on a pressure base of 14.73 pounds per square inch absolute, which were purchased by the Company during the three-month period then ended for distribution and sale to New Mexico consumers, (2) the total purchase [and] the average purchase price paid by the Company for such gas, calculated to the nearest $\frac{1}{10}$th of a cent per Mcf (herein called "Current Cost of Gas"). Such statement shall be accompanied by such detailed supporting data as the Commission may request from time to time.

(c) Whenever the Current Cost of Gas for any three-month period shall be greater or less than the average cost of gas to the Company during the three-month period ending March 31, 1971, namely, 19.2¢ per Mcf (herein called the "Base Cost of Gas"), then, commencing with bills rendered on the first day of the month after the date the report reflecting such Current Cost of Gas is filed with the Commission and ending with bills rendered on the last day of the third month after said date of filing, the price per Mcf specified in each step of each of the Affected Rate Schedules shall be increased or decreased, as the case may be, by an amount equal to the difference between the Current Cost of Gas and the Base Cost of Gas.

(d) In the event the Current Cost of Gas for any three-month period is affected by a change in the Company's gas purchase costs which occurs after March, 1971 and is subsequently set aside or disallowed, in whole or in part, by the action of any court or regulatory authority so as to result in the receipt of a refund by the Company, the Current Cost of Gas for the four three-month periods next following the one during which such refund was received by the Company shall be appropriately reduced to the end that the consumers served under the Affected Rate Schedules shall receive, in the aggregate, during said four three-month periods, the full benefit of so much of the refund received by the Company as related to gas sold by it under the Affected Rate Schedules.

As further background, the Company purchases its gas from several sources, including two wholly-owned subsidiaries, Southern Union *Producing* Company and Southern Union *Gathering* Company. The record reflects that these subsidiary companies provide the Company with approximately 26% of its natural gas needs.

On January 4, 1972 the Commission issued its order allowing Company rule 20 to become a part of the Company's rules and regulations, and modifying the general service rate schedules, making them subject to rule 20. Following an exhaustion of administrative procedures, intervenors Maestas and Nunn appealed to the district court which found for the Commission and affirmed its order of January 4, 1972. Intervenors then appealed to this Court from the lower court's decision.

The appellants base their appeal on two points, reading as follows:

POINT I. The order of the District Court upholding the approval by the Public Service Commission of Southern Union Gas Company's Rule 20, cost-of-gas adjustment clause, is unreasonable and unlawful given the unique vertical integration of the Southern Union corporate structure operating within New Mexico which allows the company to function in part free from regulation and in a manner inimical to the public interest.

POINT II. The Order of the District Court upholding the approval by the Public Service Commission of Southern Union Gas Company's Rule 20, cost-of-gas adjustment clause, should be reversed for lack of substantial evidence regarding the parent-subsidiary relationship between Southern Union Gas Company and its two wholly-owned subsidiaries.

To begin with, the stated purpose of the Company's proposed rule 20 is to increase or decrease its revenues from time to time as is necessary to compensate for increases or decreases in its actual average cost of purchased gas. The consumers of gas will be required to pay the increase in the cost of gas if, and only if, an increase occurs, and they will be given the benefit of a decrease in such cost if a decrease occurs. A majority of commissions have found great practical justification for approving adjustment clauses similar to these. See Foy, Cost Adjustment in Utility Rate Schedules, 13 Vand.L.Rev. 663, 668 (1960); Trigg, Escalator Clauses in Public Utility Rate Schedules, 106 U.Pa.L.Rev. 964, 996 (1958). Furthermore, the courts of several jurisdictions have not seen fit to invalidate such commission-approved clauses. See City Of El Dorado v. Arkansas Public Service Com'n., 235 Ark. 812, 362 S.W.2d 680 (1962); City of Chicago v. Illinois Comm. Comm'n, 13 Ill.2d 607, 150 N.E.2d 776 (1958); United Gas Corp. v. Mississippi Public Service Com'n, 240 Miss. 405, 127 So.2d 404 (1961); City Of Akron v. Public Util. Comm'n, 5 Ohio St.2d 237, 215 N.E.2d 366 (1966); City Of Norfolk v. Virginia Elec. Light & Power Co., 197 Va. 505, 90 S.E.2d 140 (1955).

As to appellants' first contention, a summary of the Commission's findings reflects the following: because of supply and demand, the wholesale price of gas will increase more rapidly than it has in the past; the Company's net income will not be changed by the operation of rule 20; the rule will have no adverse effect upon the Commission's supervisory control over the Company's rates; and no more than the actual increased cost of purchased gas will be passed on to the customers. The record reflects that all of these findings are supported by substantial evidence.

■ Appellants argue that while the Company is subject to regulation by the Commission, its Producing and Gathering subsidiaries are subject to neither Commission nor Federal Power Commission regulation. Therefore, appellants argue that there is a potential for abuse in that the Company could negotiate contracts with its subsidiaries at favorable rates, and thereby accrue hidden profits. We disagree. Section 68-5-4(A), N.M.S.A.1953 (Supp. 1971), provides that the " * * * commission shall have general and exclusive power and jurisdiction to regulate and supervise every public utility in respect to its rates and service regulations * * * and to do all things necessary and convenient in the exercise of its power and jurisdiction."

Section 68-5-4(B), N.M.S.A.1953 (Supp. 1971), amplifies this power with respect to the specific subject of contracts between utilities and suppliers, as follows:

The sale, furnishing or delivery of gas, * * * by any person to a utility for resale to or for the public shall be subject to regulation by the commission, but only to the extent necessary to enable the commission to determine that the cost to the utility of such gas, * * * at the place where the major distribution to the public begins shall be reasonable and that the methods of delivery thereof shall be adequate; Provided, however, that nothing herein contained shall be construed to permit regulation by the commission of production or sale price, at the well head, of gas or petroleum.

The above provision makes it abundantly clear that the Commission can disallow, for rate-making purposes, any portion of a price paid by a utility which the Commission finds to be unreasonable unless well head transactions are involved. Here, the subsidiary Producing Company is involved

in such well head transactions and thus is not covered by Commission regulation. However, since the legislature has not seen fit to extend the Commission's rate-making jurisdiction to such transactions, we, too, should not interfere unless there is shown to be some public harm involved. No harm was shown to have been present here. In fact, prices paid to the subsidiaries by the parent Company were shown to have been lower than the average wholesale cost of gas.

It is true that there might be some potential for abuse here between the parent and its producing subsidiary, but the record indicates that it is unlikely to occur. The parent Company buys gas from non-affiliated companies, and the subsidiaries sell gas to non-affiliated companies. Therefore, unless both choose to illegally break their binding long-term contracts with the non-affiliated companies, it will not be possible for the parent and its subsidiaries to increase dealings with each other, and thereby increase the possibility of abuse. [Note: at the present time, the parent purchases ¾ of its gas from non-affiliated suppliers and the subsidiaries sell 70–80% of their gas to non-affiliated purchasers.] Furthermore, it is unlikely that increased dealings between the parent and its subsidiaries can be physically achieved since the record indicated that the Company is not geographically connected with the subsidiaries through interstate pipelines.

Appellants' second contention that the Commission's finding that rule 20 is in the public interest is not supported by substantial evidence is refuted by the record. That the Company had the burden of proof at the hearing cannot be denied. International Min. & C. Corp. v. New Mexico P. S. Com'n, 81 N.M. 280, 466 P.2d 557 (1970). However, that burden was carried when the Company presented a prima facie case.

In New Mexico, the requirement for annulling an order of the Commission is to establish, to the satisfaction of the reviewing court, that the order is unreasonable or unlawful. § 68–9–5, N.M.S.A.1953 (Repl.Vol. 10, pt. 1, 1961). The burden of so establishing is on the party appealing from the order. § 68–9–4, N.M.S.A.1953 (Supp.1971). As stated in Llano, Inc. v. Southern Union Gas Company, 75 N.M. 7, 11–12, 399 P.2d 646, 649 (1964):

> This court has consistently held that on appeals from administrative bodies the questions to be answered by the court are questions of law and are restricted to whether the administrative body acted fraudulently, arbitrarily or capriciously, whether the order was supported by substantial evidence and, generally, whether the action of the administrative body was within the scope of its authority. The district court may not substitute its judgment for that of the administrative body.

Here, the potential for abuse is a matter of fact and we hold that the Commission had substantial evidence from which to make its findings, i. e., that there was such relevant evidence as a reasonable man might find adequate to support a conclusion. See Otero v. New Mexico State Police Bd., 83 N.M. 594, 495 P.2d 374 (1972); Young v. Board of Pharmacy, 81 N.M. 5, 7, 462 P.2d 139, 141 (1969). In other words, the Commission did not act fraudulently, arbitrarily or capriciously, and the order was supported by substantial evidence. We therefore agree with the trial court and are of the opinion that under rule 20, at least as far as the facts presented are concerned, the public interest against abuse will be protected. Affirmed.

It is so ordered.

OMAN and MARTINEZ, JJ., concur.