The HECHT COMPANY, a New Mexico Corporation, et al., Plaintiffs,

v.

SOUTHERN UNION COMPANY, a corporation, et al., Defendants.

No. 78–958–M Civil.

United States District Court, D. New Mexico.

May 14, 1979.

Michael T. Garrett, Clovis, N. M., Witherspoon, Aikin & Langley, Hereford, Tex., for plaintiffs.

Wilson W. Herndon, Jerry L. Beane, Strasburger & Price, Dallas, Tex., Charles F. Hawkins, Gen. Counsel, Southern Union Co., Dallas, Tex., Montgomery, Andrews & Hannahs, Walter J. Melendres, Santa Fe, N. M., for Southern Union Co., Southern Union Gathering Co. and Gas Co. of New Mexico.

Vinson & Elkins, Houston, Tex., John C. Snodgrass, Travis Broesche, Alison L. Smith, and Ortega & Snead, Arturo G. Ortega, Albuquerque, N. M., for Aztec Oil and Gas Co. and Southland Royalty.

Campbell & Black, Michael B. Campbell, Santa Fe, N. M., for Consolidated Oil and Gas Co., Inc.

Bingaman & Davenport, Anne K. Bingaman, Santa Fe, N. M., for Southern Union Production.

Jason W. Kellahin, Santa Fe, N. M., for Continental Oil Co., for defendants.

## ORDER

MECHEM, District Judge.

The plaintiff Hecht Company is a New Mexico corporation conducting farming activities in Curry County, New Mexico. The individual plaintiffs also engage in farming in Curry and Roosevelt Counties, New Mexico. The defendants are producers of natural gas sold for consumption in New Mexico. The defendants insist that plaintiffs by their complaint are simply contesting the state-approved rate for natural gas per mcf. The plaintiffs, however, bring their action

pursuant to the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Clayton Act, 15 U.S.C. §§ 15 and 26, alleging that the defendants have artificially raised the statewide cost of natural gas in New Mexico by combining and conspiring illegally to increase the well-head price of all natural gas sold in the State.

Various defendants have moved to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim. Some of the defendants have moved that affirmative defenses be treated as motions to dismiss. The defendants have filed numerous exhibits, each accompanied by a certification. The plaintiffs have filed extensive affidavits and exhibits. By these actions the parties have invited consideration of the motions to dismiss as motions for summary judgment. I find the latter to be the better way to treat the pending motions and all parties were so notified by Order entered April 16, 1979.

The defendants raised principally the anti-trust defenses of lack of interstate commerce, lack of standing, state action immunity, the Noerr-Pennington doctrine, and the "pass-on" defense recently considered in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). I have considered as well the doctrine of primary jurisdiction, *res judicata*, waiver, laches and estoppel. I conclude that jurisdiction is present, that the plaintiffs state a justiciable claim and that therefore the defendants' motions for summary judgment should be denied and the case heard on the merits.

### I. INTERSTATE COMMERCE

The defendants contend that the alleged restraint or price fixing does not involve a transaction within the flow of commerce and that the alleged conspiracy does not involve natural gas other than that produced in New Mexico and sold exclusively intrastate. Thus the defendants assert the complaint fails to allege the requisite effect on interstate commerce and the plaintiffs' claims must be dismissed for lack of federal jurisdiction.

■ To meet the "engaged in commerce" requirement of the Clayton Act and to be within the purview of the Sherman Act defendants' activities need not be interstate. "The proposition that intrastate activities which adversely affect interstate commerce come within the scope of the Sherman Act is established beyond question." *Burke v. Ford*, 377 F.2d 901 (10th Cir. 1967), rev'd on other grounds 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1968). The defendants' activities constitute conduct within the reach of federal antitrust law if those activities substantially and adversely affect interstate commerce. *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). Likewise the effect on interstate commerce need not be direct. 425 U.S. at 744, 96 S.Ct. 1848.

■ The defendants state that as to the natural gas supplied to the plaintiffs, "No interstate production, transmission or sale was involved." The defendants, nevertheless, in distribution of their product have the use and benefit of interstate gas lines. The plaintiffs' complaint, in addition, clearly indicates that the acts complained of have a substantial and adverse effect on the plaintiffs' interstate business and on the price of goods the plaintiffs put into interstate commerce. No "special form of pleading is indicated or sanctioned in antitrust cases. Indeed the liberal rules of pleading are as applicable to these cases as any other case." *New Home Appliance v. Thompson*, 250 F.2d 881, 883 (10th Cir. 1957). I conclude, then, that the plaintiffs have adequately set out a nexus between the defendants' concerted activities and interstate commerce sufficient to support federal jurisdiction.

### II. STANDING

Defendants argue that the natural gas in the San Juan Basin of New Mexico, the pricing of which is the basis of plaintiffs' complaint, was never physically delivered to the plaintiffs "or anyone else in Curry County or Clovis." Defendants contend

that the plaintiffs attack only a rate making process. Defendants insist that because the plaintiffs are neither producers of natural gas nor direct purchasers of natural gas from the San Juan Basin nor a target of the alleged conspiracy to fix prices, the plaintiffs have no standing to sue under the Clayton Act.

■ Standing to sue pursuant to 15 U.S.C. § 15 is a question of law to be determined by the trial court. *John Lenore and Co. v. Olympia Brewing Co.*, 550 F.2d 495, 498 (9th Cir. 1977). Plaintiffs need not be within a "target area" of an alleged illegal conspiracy to sue under the Clayton Act. A direct injury or any injury in fact is sufficient to give the plaintiffs standing. *Loeb v. Eastman Kodak Co.*, 183 F. 704, 709 (3rd Cir. 1910).

■ I need not decide which test to apply; I conclude that the plaintiffs have established a sufficient basis for standing under any of the tests utilized in antitrust actions. When the defendants agreed to the price of natural gas in the San Juan Basin they had to know by virtue of other contracts that this price would effect the price of all natural gas in New Mexico. Thus plaintiffs as consumers of natural gas in New Mexico can be said to be a target of defendants' activities and agreements. By reason of the increased cost of business and the increased cost of goods bought and sold by the plaintiffs the plaintiffs can be said to have suffered direct "*antitrust* injury . . of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

## III. PRIMARY JURISDICTION AND RES JUDICATA

■ I find the doctrine of primary jurisdiction and *res judicata* inappropriately applied to the present case. The doctrine of primary jurisdiction is limited to those instances where an administrative agency by reason of particular expertise in the area or by virtue of statutory authority has adjudi-

cative, investigatory or remedial jurisdiction over the claims. Here no administrative agency, state or federal, has statutory power over plaintiffs' claims. Neither is there any agency where the plaintiffs are required by law to exhaust their remedies nor any agency with unique expertise in the field.

The role of the New Mexico Public Service Commission will be discussed in consideration of defendants' state action defense. It suffices to say here that I am not bound by the Commission's decisions nor do I believe that the Commission has previously considered all that plaintiffs set out in this action. Accordingly, I consider the defenses of primary jurisdiction and *res judicata* of little merit.

## IV. WAIVER, LACHES AND ESTOPPEL

■ The defendants present some loosely-woven ideas regarding waiver and estoppel. They contend that because the plaintiffs did not raise all of the present issues with the New Mexico Public Service Commission they have waived a right to raise the issues here. Defendant Continental Oil Company states: "Since plaintiffs had full opportunity and notice to intervene and appear in the proceedings before the Public Service Commission in 1976, plaintiffs also must now be deemed to have waived their right to challenge the action of the Public Service Commission." I see no logic to this argument. The Public Service Commission does not hear antitrust cases. Neither the Public Service Commission nor the State of New Mexico are parties to this action. The plaintiffs are not "challenging" the actions of the Commission. Defendants' point has nothing to do with the plaintiffs' right to bring a federal court action alleging restraint of trade, price-fixing and conspiracy to raise the price of natural gas.

■ Neither is laches properly raised. The defendants have suffered no prejudice. "Lapse of time alone does not constitute laches." *Shell v. Strong*, 151 F.2d 909, 911 (10th Cir. 1945). More importantly, the

plaintiffs' case is controlled by 15 U.S.C. § 15b, a four-year statute of limitation. Laches, being an equitable consideration, is not to bar an action prior to expiration of the four-year period set by Congress. See: *International Telephone and Telegraph Corp. v. General Telephone and Electronics Corp.*, 518 F.2d 913, 927, 928 (9th Cir. 1975).

## V. THE NOERR–PENNINGTON DOCTRINE

■ Defendants, in a shotgun approach, also raise as a defense the doctrine established in *Eastern Railroad Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). Defendant Southland Royalty Company states: "Plaintiffs *may claim* that it is not the action of the New Mexico Public Service Commission of which they complain, but rather the Defendants' conduct which influenced the administrative body and ultimately affected the gas rates charged Plaintiffs." (Emphasis added.) I do not find anywhere that the plaintiffs have so claimed.

The *Noerr* doctrine is applicable only where the alleged Sherman Act violation is an attempt by private parties to induce governmental action: ". . . no violation of the Act can be predicated upon mere attempts to influence the passage or enforcement of laws." 365 U.S. at 135, 81 S.Ct. at 528. The defendants either misread the plaintiffs' complaint or failed to consider seriously Rule 11 of the Federal Rules of Civil Procedure. Had the defendants looked for "good ground to support" their *Noerr-Pennington* defense, they could have saved a much overburdened file an additional volume.

## VI. THE *ILLINOIS BRICK* DEFENSE

■ Defendant Supron contends that the ruling of *Illinois Brick Co. v. Illinois, supra,* demands the plaintiffs' case against Supron be dismissed for lack of direct injury to the plaintiffs. Supron argues:

. . . the gas delivered to plaintiffs is sold to them by Gas Company of New Mexico. In turn, Gas Company of New Mexico buys its gas from a number of producers, including SUPRON. Plaintiffs are not, however, direct purchasers of gas from SUPRON and are, therefore, not injured within the meaning of the Clayton Act according to the recent Supreme Court ruling in *Illinois Brick Co. v. Illinois* (cite omitted).

In *Illinois Brick* petitioners were manufacturers of concrete block. Three price pass-ons occurred in the case: manufacturer to masonry contractor, masonry contractor to general contractor, general contractor to customer.

The only way in which the antitrust violation alleged could have injured respondents is if all or part of the overcharge was passed on by the masonry and general contractors to respondents, rather than being absorbed at the first two levels of distribution. 431 U.S. at 727, 97 S.Ct. at 2065.

The question to be resolved in the present case is whether the plaintiffs are direct or indirect purchasers of natural gas. The gas producer Supron sells to Gas Company of New Mexico who, by benefit of a cost-plus contract, passes the full costs of its purchases to the plaintiffs. It could be said that one pass-on occurs at this point. Supron is to Gas Company of New Mexico, however, more like a supplier of powdered concrete would be to a manufacturer of bricks. The defendant Supron does not place a product on the public market; only the defendant Gas Company of New Mexico does. Supron supplies the product to the defendant Gas Company of New Mexico, who then, without transforming or processing the product, acts as a pass-through or a conduit, delivering the product to the plaintiffs.

*Illinois Brick* speaks to distribution of a product from one businessman to another, each businessman adding to the price of the product. In every transaction the mark-up of the product is clearly discernible. The product begins and ends as bricks.

Plaintiffs here produce farm products. Their claim, on the other hand, goes not to the price of farm products, but to the price

of natural gas. Plaintiffs are at once consumers of natural gas and businessmen; they may operate their homes and farms by use of natural gas, but they do not transform natural gas into wheat. Plaintiffs are direct purchasers of natural gas. Plaintiffs' customers purchase farm products. Notwithstanding that as farmer-businessmen plaintiffs put a product on the market made costlier by the cost paid for natural gas, the farmers nonetheless remain direct purchasers and ultimate consumers of natural gas. Although the products plaintiffs sell go on to others, any increase in the price of these products due to rising gas prices is not separable and distinguishable in the manner of *Illinois Brick* and does not engender or even encourage the kind of multiple antitrust claimants *Illinois Brick* was intended to prevent. The plaintiffs allege a combination and conspiracy of the suppliers of natural gas and the Gas Company of New Mexico which results directly in harm to the plaintiffs. I do not find the kind of chain considered in *Illinois Brick* and the pass-on theory does not prevent the present case.

## VII. STATE ACTION

The Sherman Act "must be taken to be a prohibition of individual and not state action." *Parker v. Brown*, 317 U.S. 341, 352, 63 S.Ct. 307, 314, 87 L.Ed. 315. Citing 62–6–4 NMSA 1978, the defendants argue that the price of natural gas to New Mexico consumers is determined by the New Mexico Public Service Commission and therefore the action of which plaintiffs complain is "governmental action wholly immune from the federal antitrust laws." The New Mexico statute states in pertinent part:

    A. The commission shall have general and exclusive power and jurisdiction to regulate and supervise every public utility in respect to its rates and service regulations, and in respect to its securities, all in accordance with the provisions; and subject to the reservation of, the Public Utility Act and to do all things necessary and convenient in the exercise of its power and jurisdiction. . . .

    B. The sale, furnishing or delivery of gas, water or electricity by any person to a utility for resale to or for the public shall be subject to regulation by the commission but only to the extent necessary to enable the commission to determine that the cost to the utility of such gas, water or electricity at the place where the major distribution to the public begins shall be reasonable and that the methods of delivery thereof shall be adequate; provided, however, that nothing herein contained shall be construed to permit regulation by the commission of production or sale price at the wellhead of gas or petroleum, except regulation of abandonment . . . 62–6–4 NMSA 1978.

By their complaint the plaintiffs allege that the defendants acted in restraint of trade by combining and conspiring illegally to raise the price of natural gas. Without reciting a long history of transactions, plaintiffs allege basically that by a collusive and contrived court action and settlement, by a triggering of "favored nation" clauses, and by use of "Rule 20" authorized by the New Mexico Public Service Commission to allow pass-through of gas purchasing costs to the consumer, the defendants artificially raised the wellhead price of natural gas and simultaneously increased natural gas rates to New Mexico consumers.

The purchaser-distributor, defendant Gas Company of New Mexico, and the natural gas producers, the other defendants here, hold contracts which include what is commonly referred to as "favored nation" clauses. These clauses provide that if the gas purchaser enters into a contract to purchase gas from another producer at a price higher than that price specified in the contract, the price agreed upon shall be escalated to equal the higher price of a subsequent contract. The Public Service Commission's "Rule 20" is titled "Adjustment of Rates to Compensate for Changes in Cost of Purchased Gas" and permits Gas Company of New Mexico to pass on to consumers charged on "Affected Rate Schedules", as

are the plaintiffs, the full cost of its gas purchases.

Although the Public Service Commission can inquire as to other costs defendant Gas Company of New Mexico can include in computation of its rate to customers, the Commission cannot inquire into wellhead prices. 62–6–4 B NMSA 1978. *Maestas v. New Mexico Public Service Commission*, 85 N.M. 571, 514 P.2d 847 (1973). When a "favored nation" clause is invoked, then, and defendant Gas Company of New Mexico increases payments to all its supplier-producers, the full cost of the increase is passed on to New Mexico consumers. Defendants rely on the Public Service Commission's sanctions of the "favored nation" clauses, of the pass-on of gas purchase costs to the consumers and of the ultimate rate charged by Gas Company of New Mexico on its "Affected Rate Schedules" as the requisite state action that bars defendants' liability under federal antitrust law.

By its statement in *Parker v. Brown, supra,* that state action was not subject to antitrust liability, the Supreme Court deferred to the concepts of federalism and affirmed Congressional intent that the Sherman Act not reach action by a state. Although the immunity thus established is without doubt, the scope of the immunity remains undefined, See: *The State Action Exemption and Antitrust Enforcement Under the Federal Trade Commission Act*, 89 Harv.L.Rev. 715 (1976).

> It is safe to assume that the language of the general exemption in *Parker* means that *some* state action is exempt; nevertheless, the language of limitation indicates that *not all* state action is exempt. Slater, *Antitrust and Government Action: A Formula for Narrowing Parker v. Brown*, 69 Northwestern L.Rev. 71, 73 (1974).

▮ Clearly, *Parker* "becomes applicable when the state, in pursuit of legitimate police power goals, seeks to replace enforcement competition with a scheme of regulation." 69 Northwestern at 91. New Mexico has a scheme of regulation and actively regulates the gas distribution and rate schedules of the defendant Gas Company of New Mexico and any distributors of natural gas that would operate on the same horizontal lines as Gas Company of New Mexico. The distinction must be made again, however, that plaintiffs are not attacking the rate-making process, but an alleged restraint of trade resulting in increased prices at the wellhead. Plaintiffs complain of actions on a level conceptually beneath that line of operations regulated by the New Mexico Public Service Commission. Plaintiffs are saying that the acts of the defendants, before the rates are subject to review by the Commission, have interjected into the rating scheme an artificial component, that is an illegally increased gas price. Thus plaintiffs maintain, and I agree, that the actions complained of are not state actions, but private actions.

Certain limits of *Parker v. Brown* can be enumerated by the case itself and by subsequent cases: (1) state action immunity is not conferred merely by a state authorizing Sherman Act violations; (2) a private conspiracy is not saved from Sherman Act liability because a state joins in the conspiracy; (3) only closely supervised anticompetitive practices in an area where a state clearly sets out its intention to substitute regulation for competition provides a clear immunity; (4) only where the individual action is compelled, as opposed to condoned, by the state will the immunity be found. See: *Parker v. Brown, supra* ; Posner, *The Proper Relationship Between State Regulation and the Federal Antitrust Laws*, 49 N.Y.L.R. 693 (1974).

The New Mexico Public Service Commission cannot regulate the price of gas at the wellhead. Quoting first the New Mexico statute set out above, the New Mexico Supreme Court states in *Maestas, supra,* at 573, 514 P.2d at 849–850:

> The above provision makes it abundantly clear that the Commission can disallow, for rate-making purposes, any portion of a price paid by a utility which the Commission finds to be unreasonable *unless well head transactions are involved.* Here the subsidiary Producing Company

is involved in such well head transactions and thus is not covered by Commission regulation. (Emphasis added.)

Neither does New Mexico law permit any other governing body to regulate the price of natural gas at the wellhead. The Natural Gas Pricing Act, 62–7–1 et seq. NMSA 1978, sets a ceiling on the price of natural gas. It does not require that producers reach or sell at the "maximum allowable base price" nor does it tell producers and purchasers how to arrive at a fair, reasonable and proper price. New Mexico leaves the price of gas at the wellhead to competition. A decision to buy or sell at the "maximum allowable base price" or any other price is not state compelled. Thus I conclude this case is not within the *Parker* rule.

New Mexico's regulatory scheme is designed to displace business freedom only on one level. It does not reach the level now called into question. The State acquiesces in a rate to be charged consumers of natural gas and authorizes a maximum wellhead price if buyers and sellers choose to reach that maximum price. Nothing in the State's scheme, however, acts to prevent the price-fixing alleged by plaintiffs. In natural gas purchasing, the State does not authorize illegal price-fixing, does not condone or join in price-fixing conspiracies, does not regulate or actively supervise the sale of gas at the wellhead and does not compel the agreements, contracts or prices agreed upon among the defendants in this action. If anticompetitive conduct occurs, as the plaintiffs allege, it is not state action.

In *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), Michigan regulated pervasively distribution of electricity, but did not regulate the distribution of electric light bulbs. Detroit Edison Company regularly furnished to five million customers both electricity and electric light bulbs. Cantor, a retail druggist selling light bulbs, charged Detroit Edison with a Sherman Act violation, "using its monopoly power in the distribution of electricity to restrain competition in the sale of bulbs . . . ." 428 U.S. at 581, 96 S.Ct. at 3113.

The Court in *Cantor* recited an "important distinction between economic action taken by the State itself and private action taken pursuant to a state statute permitting or requiring individuals to engage in conduct prohibited by the Sherman Act." 428 U.S. at 589, 96 S.Ct. at 3117. I find the *Cantor* decision much more instructive in the present case than *Parker v. Brown.*

In this case, unlike *Parker*, the only defendant is a private utility. No public officials or agencies are named as parties and there is no claim that any state action violated the antitrust laws. Conversely, in *Parker* there was no claim that any private citizen or company had violated the law. The only Sherman Act issue decided was whether the sovereign State itself, which had been held to be a person within the meaning of § 7 of the statute, was also subject to its prohibitions. Since the case now before us does not call into question the legality of any act of the State of Michigan or any of its officials or agents, it is not controlled by the *Parker* decision. 428 U.S. at 591, 96 S.Ct. at 3118.

*Cantor* emphasizes, in considering state action immunity, the importance of choice. In *Cantor*, Detroit Edison, in spite of a comprehensive regulatory scheme, had a choice with regard to the actions found to be proscribed. Similarly in this case I find that defendants have a choice. *Cantor* involved the same sort of "blend of private and public decision making" I find here. The *Cantor* court held:

. . . neither Michigan's approval of the tariff filed by respondent, nor the fact that the lamp-exchange program may not be terminated until a new tariff is filed, is a sufficient basis for implying an exemption from the federal antitrust laws for that program. 428 U.S. at 598, 96 S.Ct. at 3121.

Thus I conclude that defendants' actions of which plaintiffs complain are neither exempt nor immune from the Sherman Act by reason of state action.

## VIII. CERTIFICATION

The defendants have failed to establish their motions and the plaintiffs have presented a justiciable controversy. I conclude the motions for summary judgment must be denied on all grounds.

I recognize, however, that the case is a complex one both in law and in fact. The case of *Illinois Brick v. Illinois, supra,* is a difficult one. The state action question is frequently open to controversy. It would not serve the interests of judicial economy to keep these defendants in a lengthy action and to present the case for a jury's determination only to find out that jurisdiction was from the beginning lacking. The questions of jurisdiction presented by this case are controlling questions of law as to which there is substantial ground for difference of opinion. An immediate appeal from this Order may materially advance the ultimate termination of the litigation.

Now, Therefore,

IT IS ORDERED that the defendants' motions for summary judgment are hereby denied.